AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAR - 9 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.
One Hewlett Packard Stream Laptop, ) '18MJ8435
bearing serial number 5CD7227C91 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ____Southern____ District of ____California____ *(identify the person or describe property to be searched and give its location):* See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___21___ U.S.C. § ___841, 846___, and the application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Lopez, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 9, 2018 @ 9:00 a.m.

*Judge's signature*

City and state: El Centro, California      Honorable Peter C. Lewis, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## ITEMS TO BE SEARCHED

A Hewlett Packard Stream Laptop, bearing serial number 5CD7227C91, currently located in the evidence vault at the Bureau of Alcohol, Tobacco, Firearms and Explosives - El Centro Field Office, 2437 Enterprise Trail in Imperial, California 92251.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Electronic records, mail, messages, images, or data to be searched for and seized concerns violations of 21 U.S.C. §§ 841 and 846, Conspiracy and Possession with Intent to Distribute Methamphetamine; and 18 U.S.C. § 924(c)(1) - Possession of a Firearm in Furtherance of a Drug Trafficking Crime, and is described as follows:

1. Communications, records, or data including but not limited to emails, messages, photographs, audio files, or:

    a. tending to indicate efforts to acquire or possess firearms or ammunition, or smuggle or otherwise import or deliver controlled substances from Mexico to the United States or within the United States;

    b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to acquire or possess firearms or ammunition, or smuggle or otherwise import or deliver controlled substances from Mexico to the United States or within the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in efforts to acquire or possess firearms or ammunition, or smuggle or otherwise import or deliver controlled substances from Mexico to the United States or within the United States;

    d. tending to identify travel to or presence at locations involved in efforts to acquire or possess firearms or ammunition, or smuggle or otherwise import or deliver controlled substancesfrom Mexico to the United States or within the United States;

    e. tending to identify the user of, or persons with control over or access to, the subject phone; or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael Lopez, being duly sworn, declare and state as follows:

## INTRODUCTION

1. This affidavit supports an application for a search warrant for the following HP Stream Laptop, currently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives in Imperial, California, in the Southern District of California, and referred to as the SUBJECT DEVICE:

    a. SUBJECT DEVICE – One HP Stream Laptop, bearing serial number 5CD7227C91.

2. The SUBJECT DEVICE was seized from Guadalupe Ibarra RIVERA (RIVERA) and Vanessa DUARTE (DUARTE) incident to their arrest on October 5, 2017. The SUBJECT DEVICE is more particularly described in **Attachment A**, incorporated herein.

3. The evidence to be searched for and seized is described in Attachment B, incorporated herein.

4. Based on the information below, there is probable cause to believe that the SUBJECT DEVICE contains evidence or is an instrumentality of a crime, specifically, violations of 21 U.S.C. §§ 841 and 846, Conspiracy and Possession with Intent to Distribute Methamphetamine; and 18 U.S.C. § 924(c)(1, Possession of a Firearm in Furtherance of a Drug Trafficking Crime.

## EXPERIENCE AND TRAINING

5. I am a Special Agent (SA) with the Bureau of Alcohol Tobacco Firearms and Explosives (ATF) and have been employed in this capacity since November 2015. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. Section 2510(7) that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code Section 2516. Prior to becoming a SA with the ATF, I was employed by the Federal Bureau of Investigation (FBI) for over six

years. During my tenure at the FBI, I served as an Investigative Specialist (IS). As an IS my responsibilities entailed intelligence collection and analysis for foreign and domestic counterterrorism, foreign intelligence and counterintelligence, and nuclear counter-proliferation investigations and operations.

6. Pursuant to my employment with ATF, I attended the Criminal Investigator Training Course at the Federal Law Enforcement Training Center in Glynco, Georgia where I received fundamental training in the techniques, concepts, and methodologies of conducting criminal investigations. I attended Special Agent Basic Training at the ATF National Academy located in Glynco, Georgia, where I received extensive training on investigating various violations of federal law. While at the ATF Academy, I received specific training in firearm technology and firearm regulations. As an ATF Special Agent, I have been involved in numerous investigations into the unlawful use and possession of firearms and conspiracies associated with criminal firearm offenses. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillanceinvolving various types of informants and cooperating sources.

7. As an ATF Special Agent, I am authorized to investigate violations of the laws of the United States, collect evidence in cases in which the United States is, or may be a party in interest, and execute warrants issued under the authority of the United States. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug and humantraffickers to work in concert with other individuals and to do so by utilizing digital devices such as cellular telephones, tablets, and computers to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of drug or people generate many types of evidence including, but not limited to, digital evidence such as

2

voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. For example, load drivers smuggling controlled substances or humans within the United States are typically in telephonic contact with co-conspirators immediately prior to and following the receipt and delivery of both drugs and human cargo, at which time they receive instructions on where and when to deliver theillicit cargo.

9. Based upon my training and experience as a SA, and consultations with law enforcement officers experienced in firearms, drug, and human trafficking investigations, I am also aware that:

    a. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile and they have instant access to telephone calls, text, web, email, and voicemessages;

    b. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

    c. Drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

    d. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

    e. Drug traffickerswill use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of

3

      checkpoints and border crossings;

  f. The use of digital devices like cellular telephones, tablets, and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

  g. Individuals involved illegal possession and acquisition of firearms and drugtrafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, firearms, drugs, criminal proceeds, and assets purchased with criminal proceeds.

10. The facts set forth herein are those that I believe are relevant to the limited purposes of this affidavit, namely, to establish probable cause for the requested warrant. The affidavit does not, therefore, include each and every fact that I or other law enforcement personnel may have learned in connection with this ongoing investigation. In the affidavit, all dates and times are approximate.

11. I have knowledge of the facts set forth below based on my review of the reports, recorded statements, and evidence collected in this case. I have also spoken with the arresting California Highway Patrol (CHP) officer.

## PROBABLE CAUSE

12. On October 5, 2017, at approximately 5:28 p.m., a CHP officer performing traffic duty observed a red Chevrolet Suburban (the Vehicle) traveling southbound on State Route 86. The officer noticed the Vehicle's GPS mount was placed in a way that obscured the driver's view of the road; a violation of California Vehicle Code § 26708(a)(2). Based on this code violation, the officer initiated a traffic stop.

13. As the officer initiated contact, he noticed there were two adult occupants in the Vehicle: the driver, later identified as RIVERA; and the passenger, later identified as

DUARTE. There was also a minor in the rear passenger seat, later identified as DUARTE's son. The officer noted the key for the Vehicle was the only key on the keychain.

14. The officer asked RIVERA if the Vehicle belonged to her and she confirmed that it did. She stated her husband had bought it for her and that she had owned it for two months. She identified DUARTE and her son as her daughter-in-law and her grandson. While speaking with the occupants, the officer observed that the driver and passenger appeared to be very nervous. The officer observed that both RIVERA and DUARTE's carotid artery appeared to be pulsating, that RIVERA's hand and face appeared to be trembling, and that RIVERA continued to fidget as she spoke to him. The officer directed RIVERA out of the vehicle while he continued to speak with her.

15. RIVERA told the officer they were driving back from Los Angeles, that they had been there for two days, and that they went to visit her stepfather who had just had a heart attack. The officer then interviewed DUARTE as he collected the Vehicle Identification Number from the Vehicle. DUARTE confirmed that they were coming from Los Angeles to visit RIVERA's family members. DUARTE, however, stated that they drove up the day before. During the conversation, the officer noticed the smell of gasoline in the interior of the vehicle. He returned to RIVERA to ask about the gas tank while radioing to dispatch for a warrants check on both RIVERA and DUARTE and a crossing check on the Vehicle.

16. The officer asked RIVERA if she had gasoline inside the Vehicle or if she had spilled gasoline in the interior. RIVERA replied, "I haven't even filled up the tank yet, I need to do it." The officer asked RIVERA if she had firearms or anything illegal in the Vehicle and she replied that she did not. He then asked how much money she had on her and she replied that she had approximately $3,000. She also stated that DUARTE had no money with her. The officer noted RIVERA's nervous behavior continued throughout the conversation.

5

17. While waiting for dispatch to respond, the officer again asked RIVERA about her trip to Los Angeles. RIVERA confirmed that she had stayed for two days, beginning on Tuesday, October 3, 2018. She stated that they had stayed at her stepfather's brother's home. The officer then asked for and received consent to search the vehicle. While completing the consent form, RIVERA was asked if anyone had asked her to bring anything for them that day. RIVERA replied that no one did. She then confirmed that everything in the Vehicle belonged to her and that she crosses the border frequently. Finally, RIVERA reconfirmed that she had no more than $3,000 on her person, and did not have any drugs or guns in her possession.

18. The officer then spoke with DUARTE. DUARTE confirmed that they had driven from Yuma to Los Angeles the day before. DUARTE stated they drove to a hotel but she could not remember the name. They visited RIVERA's family members, ate at a Denny's, then returned to the hotel and went to sleep. The next day, they began to drive home. Before exiting the Vehicle, DUARTE stated that only the bag on the floor belonged to her. As she took her son out of the vehicle, the officer noticed that DUARTE had a large amount of money in her rear pocket. She stated it was $100 in $20's, but based on the size of the bundle, the officer estimated it was significantly more than $100.

19. Prior to searching the vehicle, officers employed a Human/Narcotics Detection Dog which alerted to a black purse near the right rear floorboard of the Vehicle. A search of the purse revealed five bundles of currency, which the officer at the time estimated to be approximately $10,000, at the time. However, the money found in the purse was subsequently counted and determined to be $9,708 in United States currency.

20. After the alert, officers were informed that the Vehicle had crossed the border the day before, on October 4, 2018, which was inconsistent with what RIVERA and DUARTE had previously told them. Officers asked RIVERA when she went to Los Angeles and she replied that it was on Tuesday night, after she came back from Mexico.

6

Officers then asked her if she went there yesterday, and, after hesitating, she replied that she had gone yesterday morning.

21. Officers asked RIVERA about the $3000 that she had previously stated she had on her person. RIVERA claimed it was on her debit card and then stated her mother in Mexico was very sick. Officers then asked her if she had any cash in the car and she said "no." Officers again asked her if she had any cash in the Vehicle and she replied that there was cash that was going to her mother. RIVERA stated she had approximately $9,000 in the Vehicle. RIVERA first stated that the money was from her husband's trucking business and that it was going to Mexico for her mother's funeral. RIVERA stated the money "now belongs to me" but that she had picked it up from her stepfather. She claimed her four brothers worked for her husband's trucking company, that she received it the day before at her stepfather's house, and that she was going to Mexico today. The officer observed RIVERA walk over to DUARTE and say, "[b]ecause we went to see Tio Rito in Hesperia. It's ok for the money." RIVERA and DUARTE were then detained.

22. A further search of the vehicle revealed that the bolts beneath the rear seats had recently been tampered with. The seats were removed and officers observed a hole cut into the floor of the Vehicle beneath the carpet. In a non-factory compartment built into the floor of the Vehicle, officers observed an AR-15 style firearm with a pistol grip bearing no serial number. An additional search revealed nine bundles of a substance that tested positive for methamphetamine and had a net weight of 9.10 pounds (4.127 kilograms). The firearm was removed, measured, and determined to have a shortened 8-inch barrel with a high-capacity 30-round magazine.

23. CHP, assisted by ATF, conducted a recorded post-arrest interview of RIVERA. RIVERA was advised of her *Miranda* rights and agreed to make a statement. RIVERA denied knowledge of the firearms and drugs found in the Vehicle. RIVERA stated that DUARTE had asked her to accompany her to Hesperia, California to see RIVERA's stepfather. She stated they drove straight to the stepfather's home and stayed

7

the night there. The stepfather gave her the money found in her purse, which was meant for RIVERA's mother who is ill. RIVERA's brothers had gathered the money and given it to her stepfather, who then gave it to her. RIVERA stated that they did not go anywhere else that day. She stated she is the only person with access to the Vehicle and did not let anyone else drive it that night. They were driving back to Yuma, Arizona when they were detained.

24. CHP, assisted by ATF, also conducted a recorded post-arrest interview of DUARTE. DUARTE was also advised of her *Miranda* rights and agreed to make a statement. She also denied knowledge of the drugs and firearms found in the vehicle. She stated that RIVERA had asked her to accompany her to visit her stepfather in Hesperia, California. DUARTE stated they had stopped at a Denny's prior to arriving at the stepfather's home the night before. DUARTE stated they had spent the night at a hotel. DUARTE also stated that they were driving back to Yuma, Arizona when they were detained.

25. The SUBJECT DEVICE was seized from Vehicle at the time of RIVERA and DUARTE's arrest by CHP. The SUBJECT DEVICE was later transferred to the custody of ATF.

26. Since their arrest, records checks revealed that an individual named Guillermo REYES-Barajas (REYES-Barajas), and believed to be RIVERA's husband, was arrested near Yuma, Arizona on December 12, 2017. At the time of his arrest, REYES-Barajas was the driver and sole occupant of a gray Chevrolet Tahoe that entered a United States Border Patrol Checkpoint on Interstate 8. REYES-Barajas appeared to be nervous and was sent to secondary for further inspection. During the inspection, a canine alerted to REYES-Barajas' vehicle. A subsequent search of the vehicle revealed 70 packages in the rear of the vehicle, concealed in natural voids within the vehicle. Further testing determined that the packages contained methamphetamine and weighed approximately 34.77 kilograms. During a post-arrest statement, REYES-Barajas admitted knowledge of the drugs in his vehicle.

8

27. Based upon my experience and investigation in this case, I believe that RIVERA and DUARTE, as well as other persons as yet unknown, were involved in an on-going conspiracy to import, possess, and distribute large quantities of methamphetamine, and firearms into and within the United States and the Republic of Mexico, incorporating the Southern District of California. Based on my experience investigating drug and firearm traffickers, I also believe that RIVERA and/or DUARTE used the SUBJECT DEVICE to coordinate with co-conspirators regarding the trafficking of controlled substances and firearms and to otherwise further this conspiracy both inside and outside the United States.

28. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of digital devices, which may identify other persons involved in drug and firearm trafficking activities.

29. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotic and firearm trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the drug and firearm trafficking activities of RIVERA and DUARTE, and co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the SUBJECT DEVICE described herein.

**Procedures for Electronically Stored Information**

30. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures to search the SUBJECT DEVICE, and locate any data contained therein that is subject to seizure pursuant to this warrant:

**Forensic Imaging**

a. After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is

9

an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image is obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive - the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

      b.    If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. As the Subject Device was seized at the time of arrest, after verified images have been obtained, the Subject Device will be returned to the ATF absent further application to this court.

### Identification and Extraction of Relevant Data

      c.    After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including

permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

        d.    Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic maildatabases and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

11

   e. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

   f. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent to 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent to 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And,

12

once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

    g.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

    a.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

### Genuine Risks of Destruction

31. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

### PRIOR ATTEMPTS TO OBTAIN INFORMATION

32. The United States has not attempted to obtain this information by other means.

//
//
//
//
//
//

13

## CONCLUSION

33. Based on my training and experience, and the foregoing facts, I believe there is probable cause to believe the items listed above, which are the fruits, instrumentalities, and evidence of violations of 21 U.S.C. §§ 841 and 846 (Conspiracy and Possession with Intent to Distribute Methamphetamine); and 18 U.S.C. § 924(c)(1) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) will be found in the SUBJECT DEVICE, which is more particularly described in Attachment A.

34. Therefore, I respectfully request a warrant issue authorizing the seizure of the items described in Attachment B.

_____
Michael Lopez, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to and subscribed before me this ~~28th day of February, 2018.~~ March 9, 2018 *PCL*

_____
HONORABLE PETER C. LEWIS
United States Magistrate Judge

14